UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DO NO HARM,

                              Plaintiff,

                    -against-

PFIZER INC.,

                              Defendant.

1:22-cv-07908 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

On September 15, 2022, Plaintiff Do No Harm filed a Complaint and Emergency Motion for a Preliminary Injunction and Temporary Restraining Order against Defendant Pfizer Inc. ECF Nos. 1 ("Compl."), 5 ("Motion"). Plaintiff alleges that one of Defendant's fellowship programs discriminates against white and Asian-American applicants. Compl. ¶ 3. Plaintiff withdrew its request for a temporary restraining order during a conference on September 21, 2022. *See* ECF No. 25. For the following reasons, Plaintiff's request for a preliminary injunction is DENIED and this action is DISMISSED.

## BACKGROUND

### I.  The Parties

Plaintiff Do No Harm is a Virginia-based nationwide membership organization. Compl. ¶ 9. Its members include "physicians, healthcare professionals, medical students, patients, and policymakers who want to protect healthcare from radical, divisive, and discriminatory ideologies, including the rise in explicit racial discrimination in graduate and postgraduate medical programs." *Id.* Do No Harm was founded six months prior to filing this action and, since it was founded, it has filed multiple complaints against what it perceives to be

discrimination against white and Asian-American individuals.  *Id.* ¶ 10; ECF No. 30 ("Opp.") at 5.

Defendant Pfizer is a global research-based company engaged in the business of the discovery, development, manufacture, marketing, sale, and distribution of biopharmaceutical products.  Compl. ¶¶ 12, 18; ECF No. 33 ("Gramling Decl.") ¶ 3.  It is headquartered and has its principal place of business in New York, New York.  Compl. ¶ 13.

## II. Recruiting, Retaining, and Promoting Diverse Talent

Defendant states that it strives to build and retain a talented and diverse workforce across all levels of the company.  ECF No. 32 ("Bruce Decl.") ¶ 4.  It views diversity at the company as including "socioeconomic status, first generation status, military status, membership in a minority racial group, and membership in the LGBTQ+ community."  *Id.* ¶ 5.  But Defendant has faced challenges with recruiting, retaining, and promoting diverse talent.  *Id.* ¶ 8.

Defendant's employee positions are grouped into various levels.  *Id.* ¶ 6.  The positions are, in order of seniority: analyst, manager and senior manager, director and senior director, vice president and above.  *Id.*  Defendant relies substantially on internal promotion for senior positions, and generally prefers candidates with at least a graduate degree for those positions.  *Id.*

Defendant's data shows that minority groups are underrepresented at the company, and that this gap increases at more senior positions.  *Id.* ¶¶ 7-8.  Defendant points out that, for 2019 and 2020, its employees who identify as Black/African American, Latino/Hispanic, or Native American made up only between zero and eight percent of Defendant's workforce at each of the analyst, manager, and director levels.  *Id.* ¶ 7; Opp. at 2.  Defendant states that its difficulty in recruiting and retaining diverse college graduates for analyst-level positions and diverse master's degree holders for manager-level positions has contributed to decreasing minority representation

with increasing seniority.  *Id.*  Data from the Bureau of Labor Statistics shows that the

Pharmaceutical and Medicine manufacturing industry, as a whole, faces similar – although less

significant – racial disparities.  Bruce Decl. ¶ 10.

In 2019, Defendant set "Opportunity Parity Goals" to address the underrepresentation of

minority groups and increase diversity in its leadership positions over the next five years.  *Id.* ¶ 9.

In order to achieve parity at the vice president and above levels for U.S. minorities, Defendant's

Opportunity Parity Goals seek to increase minority representation at the vice president and above

levels from 19% to 32% and double the population of Defendant's Black/African American and

Latino/Hispanic workforce.  *Id.* ¶ 9.

### III. The Breakthrough Fellowship Program

Defendant launched the Breakthrough Fellowship Program (the "Fellowship") in 2021.

Compl. ¶ 31.  Defendant designed the Fellowship to address its challenges with recruiting,

retaining, and promoting diverse talent, and to increase underrepresented groups in leadership

positions at the company.  Bruce Decl. ¶¶ 11-12.  The Fellowship is a prestigious program and

represents a nine-year commitment by Defendant to 20 fellows in each cohort year.  *Id.* ¶ 13;

Compl. ¶ 32.  The Fellowship's inaugural cohort commenced in 2021 and the second cohort

began in 2022.  Bruce Decl. ¶ 19.

The Fellowship proceeds through multiple stages.  Compl. ¶ 35; Bruce Decl. ¶ 14.

Students apply during their junior year of college.  Compl. ¶ 33; Bruce Decl. ¶ 14.  Selected

fellows complete a summer internship at the company between their junior and senior college

years.  Compl. ¶ 34; Bruce Decl. ¶ 14.  After graduating from college, successful fellows return

to the company for a two-year position at the analyst level.  Compl. ¶ 35; Bruce Decl. ¶¶ 14-15.

Fellows who successfully apply and are admitted into a Master's in Business Administration

("MBA"), Master of Public Health ("MPH"), or a Master of Science in Statistics ("MS Statistics") program attend a two-year graduate program, paid for by Defendant, to earn one of these degrees.  Compl. ¶ 36; Bruce Decl. ¶ 15.  Successful fellows return to the company for paid internships during their first and second years of graduate study.  Compl. ¶ 37; Bruce Decl. ¶ 16. Defendant invites fellows who have completed their internships and graduate degree program to return to the company in a full-time, manager-level position.  Compl. ¶ 38; Bruce Decl. ¶ 16.

Applicants to the Fellowship must meet certain requirements.  Bruce Decl. ¶ 18. Specifically, the applicant must: be a U.S. citizen or permanent resident; be an undergraduate student enrolled in a full-time university program and graduate the following year; show a committed interest and intent to pursue an MBA, MPH or MS Statistics program; apply to a Breakthrough Fellowship Intern opportunity on the Pfizer website; have earned a grade point average ("GPA") of 3.0 or higher; demonstrate exceptional leadership potential; and be willing to work in New York City or another Pfizer location as indicated by the job posting.  ECF Nos. 5-5 ("Pl. Ex. A") at 5-6, 5-6 ("Pl. Ex. B") at 1-2; Bruce Decl. ¶ 18; Compl. ¶ 42.[1]

Applicants must also "[m]eet the program's goals of increasing the pipeline for Black/African American, Latino/Hispanic and Native Americans."  Pl. Ex. A at 5; Pl. Ex. B at 2; Bruce Decl. ¶ 18; Compl. ¶ 45.  Plaintiff contends that this means that the Fellowship "categorically excludes white and Asian American applicants" and applicants must "be Black/African American, Latino/Hispanic, or Native American."  ECF No. 5-8 ("Opening Br.") at 1.  Plaintiff alleges that "white and Asian-American applicants need not apply" in light of the selection criteria.  Compl. ¶ 5.  Plaintiff does not allege that white or Asian-American applicants,

---

[1] Unless otherwise stated, the pagination for exhibit record citations refers to the ECF-generated page numbers.

including the purported members who have submitted declarations in this lawsuit, have ever tried

to apply or that such applicants have applied and not been selected to the Fellowship.  Defendant

states in its brief, without further explanation, that "nothing in the materials about the Fellowship

. . . categorically bans any applicant from applying."  Opp. at 22.

The Fellowship selection process is highly competitive.  Bruce Decl. ¶¶ 13, 22.

Defendant received 2,600 applications for the 2021 cohort and 1,000 applications for the 2022

cohort.  *Id*. ¶ 20.  Of these, Defendant selected 40 total fellows.  *Id*. ¶ 21.  Every fellow selected

received a "top tier" rating in the screening interview and "well exceed[ed] Pfizer's minimum

criteria for selection to the Fellowship."  *Id*. ¶¶ 22-24.  Defendant's Director of Early Pipeline

Lead states that she is not aware of any employee of Defendant who has been "terminated to

make room for any Fellowship recipient."  *Id*. ¶¶ 3, 34.

The application window for the 2023 Fellowship will open in early January 2023 and

remain open for three weeks.  Bruce Decl. ¶¶ 25-26.  It takes Defendant approximately eight

weeks to complete the application-screening process; two weeks to extend offers and receive

acceptances; and four weeks to complete the hiring and background check processes.  *Id*. ¶ 26.

Selected 2023 fellows would begin their internships in early June 2023.  *Id*. ¶ 25.  Defendant has

"carefully planned" this recruiting schedule and reports that, if the process is delayed, "at least

some highly talented, extraordinary candidates that Pfizer wishes to recruit to its program will

pursue opportunities other than the Fellowship."  *Id*. ¶ 27.

Defendant posted announcements, Frequently Asked Questions ("FAQs"), an

informational video, and advertisements for the Fellowship on the internet, including on

Defendant's website, Facebook, LinkedIn, and ZipRecruiter.  Compl. ¶ 31; Pl. Ex. A; Pl. Ex. B;

ECF Nos. 5-7 ("Pl. Ex. C").  The informational video states that Defendant intends, by 2025, to

"have a generation of 100 new leaders at Pfizer coming from underrepresented groups and lead [sic] on this organization."  Compl. ¶ 46; Pl. Ex. C at 2.  The FAQs, under the heading "I'm not from a minority group identified for the Breakthrough Fellowship Program; what opportunities are available to me?", states that "Pfizer is an equal opportunity employer" and provides information on additional early career programs offered at the company for "[u]ndergraduates and graduate students who are not eligible or interested" in the Fellowship.  Pl. Ex. B at 2.  The Breakthrough Fellowship Program Associate job description states that "Pfizer is committed to equal opportunity in the terms and conditions of employment for all employees and job applicants without regard to race . . . ."  Pl. Ex. C at 4.

In addition to the Fellowship, Defendant offers several other early-career programs. Bruce Decl. ¶ 28.  These include the Summer Growth Experience Program, Global Supply Program, Digital Rotational Program, MBA Summer Associate Program, and Refugee Leadership Initiative.  *Id.*  People of all backgrounds are encouraged to apply to these programs. *Id.* ¶ 29.  Defendant also offers its Educational Assistance Program ("EAP") to benefits-eligible employees.  *Id.* ¶ 33.  The EAP provides $10,000 per year for recipients to pursue an advanced degree or other educational opportunity related to their employment.  *Id.*

### IV. Member A and Member B

Plaintiff brought this action on behalf of two of its purported members – Member A and Member B – and submitted anonymous declarations from these members.  Compl. ¶ 49; ECF Nos. 5-2 ("A Decl."), 5-3 ("B Decl."); Opening Br. at 7.  Member A is white.  A Decl. ¶ 2. Member B is Asian-American.  B Decl. ¶ 2.  Both members are allegedly in their junior year at unidentified Ivy League universities; are U.S. citizens; maintain a GPA higher than a 3.0 average; are involved in campus life; hold leadership positions on their college campuses; and

would like to apply to the Fellowship.  A Decl. ¶¶ 2-6; B Decl. ¶¶ 2-6.  Member A has allegedly

been involved in volunteer programs and expects to graduate in December 2023.  A Decl. ¶¶ 3,

6.  Member B allegedly expects to graduate in Spring 2024.  B Decl. ¶ 3.  According to the

declarations, Member A would "benefit greatly" from working in Defendant's New York City

office, and Member B would "greatly enjoy" doing so.  A Decl. ¶ 7; B Decl. ¶ 7.  Both members

allege they are "drawn" by the Fellowship's scholarship component.  A Decl. ¶ 8; B Decl. ¶ 8.

The declarations allege that both members are "able and ready" to apply to the 2023

Fellowship class "if Pfizer stops" discriminating by race, and that the members are prepared to

meet the Fellowship's requirements and expectations if they are accepted to and join the

Fellowship.  A Decl. ¶¶ 9-10; B Decl. ¶¶ 9-10.  Both members further allege that they are

proceeding under a pseudonym because they fear reprisal if their participation in this litigation

becomes public.  A Decl. ¶ 12; B Decl. ¶ 12.[2]

At a conference on September 21, 2022, the Court observed that Plaintiff had not

identified the two members by name in signed declarations or otherwise, and asked Plaintiff to

address this issue in its further submissions.  To-date, Plaintiff has not identified either "Member

A" or "Member B" by name.

## V.  Defendant's Relationship with the Federal Government

Defendant has partnered with healthcare providers, government health agencies, research

hospitals and institutes, and other pharmaceutical companies.  Compl. ¶ 21.  Between 2014 and

2019 – prior to the facts underlying this action – Defendant's Center for Therapeutic Innovation

("CTI") collaborated with researchers from the National Institutes of Health ("NIH").  *Id*. ¶ 22;

---

[2] Plaintiff adds, on Reply, that both members are deterred from applying to the Fellowship by the
Fellowship advertising.  ECF No. 36-1 ("Reply Rasmussen Decl.") ¶ 4.

Gramling Decl. ¶ 8.  Defendant also participates in the Accelerating Medicines Partnership ("AMP"), a public-private partnership between NIH, the Food and Drug Administration ("FDA"), and private pharmaceutical companies.  Compl. ¶ 23; Gramling Decl. ¶ 6.  The AMP is managed by a separate organization called the Foundation for the NIH ("FNIH").  Compl. ¶ 26. NIH has funded, through the FNIH, specific AMP projects that are targeted at specific diseases. *Id*. ¶¶ 25-26, 28.  Additionally, Plaintiff alleges that Defendant "receives federal financial assistance through federal healthcare program (*e.g.*, Medicare and Medicaid) reimbursements and other monetary and non-monetary assistance."  Compl. ¶ 15.

Notwithstanding these private-public partnerships, Defendant submitted a declaration from its Assistant General Counsel affirming that Defendant does not provide any medical treatment or administer any health care; does not receive any financial assistance from the federal government to operate its business as a whole; has not received any monetary assistance from the government through its participation in AMP or the collaboration with NIH; and does not receive any Medicare or Medicaid reimbursement directly from the federal government. Gramling Decl. ¶¶ 4-5, 7, 9-10.  Additionally, Defendant submitted a declaration from its Director of Early Lead Pipeline affirming that the Fellowship does not receive, and is not funded by, any type of assistance from the federal government.  Bruce Decl. ¶ 17.

## VI. Procedural History

Plaintiff filed its Complaint and Emergency Motion for a Preliminary Injunction and Temporary Restraining Order on September 15, 2022.  *See* Compl.; Motion.  Plaintiff asserts 15 claims under federal, state, and city law.  *See generally* Compl.  Specifically, it brings claims under Section 1981 of the Civil Rights Act of 1866 (Count I), Title VI of the Civil Rights Act (Count II), Section 1557 of the Affordable Care Act (Count III), and the New York State Human

Rights Law and New York City Human Rights Law, which prohibit racial discrimination with respect to employment, internships, and training programs (Counts IV–IX) and advertising of the same (Counts X–XV).  Compl. ¶¶ 71-213.  In short, Plaintiff asserts that Defendant "is running a racially discriminatory fellowship – the Breakthrough Fellowship Program – that categorically excludes white and Asian-American applicants."  *Id*. ¶ 3.

The Court held a conference with counsel for all parties on September 21, 2022.  ECF No. 25.  On the record at the conference, Plaintiff withdrew its request for a temporary restraining order.  *See id*.  Defendant filed opposition papers on October 25, 2022.  ECF Nos. 30-33.  Plaintiff filed its Reply on November 8, 2022.  ECF No. 36.

## DISCUSSION

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008); *see We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 279 (2d Cir. 2021) ("Issuance of a preliminary injunction is an extraordinary and drastic remedy . . . [and] should not be routinely granted." (internal citations and quotation marks omitted)).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter*, 555 U.S. at 20; *accord Pharaohs GC, Inc. v. United States SBA*, 990 F.3d 217, 225 (2d Cir. 2021) (same).

A preliminary injunction "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (internal citation omitted).  Further, where a plaintiff "seeks a preliminary injunction that will alter the status quo," it must satisfy a heightened standard by demonstrating "a 'substantial' likelihood of success on the merits," *Pharaohs GC, Inc.*, 990 F.3d at 225 (internal citation omitted), and "a

'strong showing' of irreparable harm," *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) (internal citation omitted).  A preliminary injunction motion should be denied if a plaintiff fails to show either irreparable harm or a likelihood of success on the merits. *See, e.g.*, *Pharaohs GC, Inc.*, 990 F.3d at 232 (a plaintiff's "failure to show a clear or substantial likelihood of success on the merits stands in the way of any preliminary relief"); *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 68 (2d Cir. 2007) ("The finding of no showing of irreparable harm is dispositive.").  When considering these standards, "the Court need not accept as true the well-pleaded allegations in Plaintiff['s] complaint," *Coney Island Prep v. U.S. Dep't Health & Hum. Servs.*, 506 F. Supp. 3d 203, 209 (S.D.N.Y. 2020) (internal citation omitted), and "may consider the entire record including affidavits and other hearsay evidence," *J.T. v. de Blasio*, 500 F. Supp. 3d 137, 181 (S.D.N.Y. 2020) (quoting *Sterling v. Deutsche Bank Nat'l Tr. Co. as Trs. for Femit Tr. 2006-FF6*, 368 F. Supp. 3d 723, 725 n.2 (S.D.N.Y. 2019)).

As a threshold matter, the party invoking federal jurisdiction "bears the burden of establishing standing."  *Faculty v. N.Y. Univ.*, 11 F.4th 68, 74 (2d Cir. 2021), *cert. denied sub nom. Fac., Alumni, & Students Opposed to Racial Preferences v. N.Y. Univ.*, 142 S. Ct. 2813 (2022).  "When a preliminary injunction is sought, a plaintiff's burden to demonstrate standing 'will normally be no less than that required on a motion for summary judgment.'"  *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 907 n.8 (1990)).  "Accordingly, to establish standing for a preliminary injunction, a plaintiff cannot rest on such mere allegations, as would be appropriate at the pleading stage, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true."  *Id*. (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)) (internal quotation marks and brackets omitted).

An organization has standing to bring suit on behalf of its members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Faculty*, 11 F.4th at 74 (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

To satisfy the first prong of associational standing, *i.e.*, that its members would otherwise have standing to sue in their own right, a plaintiff "must show that one or more of its members has: (1) 'suffered an injury-in-fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical'; (2) 'there must be a causal connection between the injury and the conduct complained of'; [and] (3) 'it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Id*. at 74 (quoting *LaFleur v. Whitman*, 300 F.3d 256, 269 (2d Cir. 2002)).

If a plaintiff fails to establish standing, the court "need not address the factors to be considered in deciding whether to award a preliminary injunction" and should instead deny the motion and dismiss the case for lack of subject matter jurisdiction. *Rojas v. Cigna Health & Life Ins. Co.*, 793 F.3d 253, 259 (2d Cir. 2015) (affirming denial of motion and dismissal of case where the plaintiff failed to establish standing to move for a preliminary injunction); *Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 251 (2d Cir. 2008) ("Appellants' motion for a preliminary injunction should therefore have been dismissed for lack of jurisdiction, rather than on the ground that appellants are unlikely to succeed on the merits of their action."); *see also Munaf v. Geren*, 553 U.S. 674, 691 (2008) ("Review of a preliminary injunction is not confined to the act of granting the injunction, but extends as well to determining whether there is any insuperable objection, in point of jurisdiction or merits, to the maintenance of the bill, and, if so,

to directing a final decree dismissing it." (internal quotation marks, brackets, and citation omitted)).

## I. Standing

Plaintiff brings this action as an association on behalf of its members. *See* Reply at 7 n.4. Accordingly, Plaintiff must satisfy the three requirements for associational standing set forth above. *See Faculty*, 11 F.4th at 74. Defendant argues, among other things, that Plaintiff has not established the first prong – that its members would otherwise have standing to sue in their own right. Opp. at 7. The Court agrees. Plaintiff has failed to establish that at least one of its members has Article III standing. Plaintiff has additionally failed to show that any member has statutory standing to bring the federal claims.

### A. Article III Standing

#### 1. Identification of Members with Standing

Associational standing requires that a plaintiff identify by name at least one member with standing. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 498-99 (2009) (holding that this "requirement of naming the affected members has never been dispensed with" except where "*all* the members of the organization are affected by the challenged activity"); *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 235 (1990) (finding association lacked standing because an affidavit referencing but not naming "one or two" individuals with standing "fail[ed] to identify the individuals"). In other words, "Plaintiff is required to identify at least one affected member by name." *Pen Am. Ctr., Inc. v. Trump*, 448 F. Supp. 3d 309, 320-21 (S.D.N.Y. 2020) (rejecting the "argu[ment] that Plaintiff need not name an injured member at the pleading stage for associational standing" (internal quotation marks and citations omitted)).

Plaintiff argues that, notwithstanding this precedent, there is no requirement that a member be named for purposes of associational standing.  Reply at 3-5.  Further, Plaintiff argues this is especially true where anonymous declarations are submitted on members' behalf because those members wish to remain unnamed.  *Id.*  Defendant argues that *Summers* and other case law establish that Plaintiff must name the members upon whose standing Defendant relies, and that the anonymous member declarations are not enough.  Opp. Br. at 9-10.  The Court agrees with Defendant.

The Court finds the Supreme Court's decision in *Summers* controlling.  In *Summers*, the petitioners asserted associational standing on behalf of their members to challenge certain regulatory projects.  555 U.S. at 498-99.  For one challenged project – the Burnt Ridge Project – the petitioners submitted an affidavit of a named association member, which the Government conceded was "sufficient to establish Article III standing with respect to Burnt Ridge."  *Id.* at 494.  But the petitioners did not identity by name any member with standing to challenge the other specific projects.  *Id.* at 495.  The Court determined that, as to those projects, the petitioners did not satisfy "the requirement of injury in fact[, which] is a hard floor of Article III jurisdiction . . . ."  *Id.* at 497.

The Supreme Court in *Summers* rejected the contention that the petitioners could establish associational standing based on "the organization's self-description of the activities of its members," because such an approach "would make a mockery of our prior cases, which have required plaintiff-organizations to make specific allegations establishing that at least one identified member had suffered or would suffer harm."  *Id.* at 497-98.  As an example, the Supreme Court cited approvingly its decision in *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 235 (1990), where it held that an affidavit that alleged that "one or two" of the petitioners had

13

standing was insufficient "because it did not name" the specific individuals who were harmed by the challenged program and therefore could have standing in that case. *Summers*, 555 U.S. at 498.

The *Summers* Court concluded that the "requirement of naming the affected members has never been dispensed with" except where "*all* the members of the organization are affected by the challenged activity." *Id*. at 498-99. Here, Plaintiff argues that *Summers* does not apply because Plaintiff has submitted anonymous member declarations. Reply at 4. But the Supreme Court recognized only one exception to the naming requirement, and Plaintiff's declarations do not fall within that exception. Accordingly, because Plaintiff does not allege that all of its members are affected, *Summers* requires that it identify by name at least one member with standing. *Summers*, 555 U.S. at 498-99.

The weight of authority in federal courts reaffirms that at least one member must be named for associational standing. In this Circuit, courts in at least three cases have rejected Plaintiff's argument and concluded that an associational plaintiff must identify a member with standing by name. *See, e.g.*, *Pen Am. Ctr., Inc.*, 448 F. Supp. 3d at 320-21 (rejecting the "argu[ment] that Plaintiff need not name an injured member at the pleading stage for associational standing" and holding that "Plaintiff is required to identify at least one affected member by name" (internal quotations and citations omitted)); *Equal Vote Am. Corp. v. Pelosi*, 397 F. Supp. 3d 503, 509 (S.D.N.Y. 2019) ("And in order to bring claims on behalf of its members under the 'associational standing' doctrine, an organizational plaintiff such as EVA must identify, by name, at least one member with standing."); *Residents & Fams. United to Save Our Adult Homes v. Zucker*, No. 16-cv-1683 (NGG) (RER), 2018 WL 1175152, *6 (E.D.N.Y.

Mar. 5, 2018) (finding an association lacked standing because it did not specifically identify and name members who were injured).

Plaintiff cites one case from this District that reached a contrary result.  *See New York v. U.S. Dep't of Com.*, 351 F. Supp. 3d 502, 606 n.48 (S.D.N.Y. 2019) (allowing non-governmental organizational plaintiffs to proceed with unnamed members), *rev'd on other grounds*, 139 S. Ct. 2551 (2019) (finding standing as to *governmental* plaintiffs on other grounds and not addressing the naming issue).  There, the district court permitted members to remain unnamed, "to the extent that standing [for those members] depends only on the facts of their existence and residence in a particular jurisdiction." *Id*. at 606.  This is a far cry from the case at hand where numerous characteristics of the members must be examined to determine standing, including their background, qualifications to apply for the Fellowship, future career intentions, etc. *See infra* at 19-24.  One case in this District cites to *New York v. United States Department of Commerce* for the premise that members may be unnamed for purposes of associational standing. *See NRDC, Inc. v. Wheeler*, 367 F. Supp. 3d 219, 227 (S.D.N.Y. 2019) (citing *New York*, 351 F. Supp. 3d at 606).  But the court there recognized that an association "must nevertheless establish that 'at least one identified member has suffered or would suffer harm,'" and the plaintiff's members in that case did submit named declarations, even if the members' names were not provided in the initial complaint.  *Id*. at 227, 231-32 (internal citation omitted).  The other cases cited by Plaintiff are non-binding decisions from outside of this Circuit, and at least three pre-date *Summers*.[3]

---

[3] *See, e.g.*, *Doe v. Stincer*, 175 F.3d 879 (11th Cir. 1999) (pre-dating *Summers*); *Disability Rts. Wis., Inc. v. Walworth Cnty. Bd. of Supervisors*, 522 F.3d 796 (7th Cir. 2008) (same); *NAACP v. Trump*, 298 F. Supp. 3d 209, 225 n.10 (D.D.C. 2018) (relying on pre-*Summers* cases); *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1114 (11th Cir. 2022) (without considering whether names are required, allowing associational standing based on unnamed members); *McGehee v.*

The Second Circuit has not considered the *Summers* naming requirement.  In *Faculty v. New York University*, the appellant relied on a pre-*Summers* case to argue that they were "not required to 'name names' of injured members in its standing allegations at the pleading stage." 11 F.4th at 76.  The Second Circuit did not address the argument, however, because even under the appellant's theory it lacked standing for other reasons.  *Id*.  More recently, the Second Circuit considered a related issue of whether a *pro se* party may proceed only under a pseudonym and sign their brief, motion, or other papers under that pseudonym.  *Publicola v. Lomenzo*, No. 22-795, 2022 WL 17256714, __ F.4th __ (2d Cir. Nov. 29, 2022) (per curiam).  The Second Court held that a party may not do so because, "[b]y signing his briefs under the fictitious name "Publius Publicola," Appellant has not made himself 'readily identifiable' to the Court."  *Id*. at *3 (internal citations omitted).

Other Courts of Appeal that have addressed the naming requirement since *Summers* have repeatedly held that "an affidavit provided by an association to establish standing is insufficient unless it names an injured individual."  *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016) (requiring the submission of an affidavit from a named member for associational standing); *see, e.g.*, *Associated Gen. Contractors of Am. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013) (finding an association lacked standing to challenge an affirmative action plan because it did "not identify any affected members by name"); *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1204 (11th Cir. 2018) (rejecting argument based on pre-*Summers* precedent and recognizing the post-*Summers* "requirement that an organization name at least one member who

---

*Neb. Dep't of Corr. Servs.*, No. 18-cv-03092, 2019 WL 1227928, *2 (D. Neb. Mar. 15, 2019) (finding an affidavit from the "President of Pharmacy N" sufficient because it was "made by a readily identifiable person" – *i.e.*, a singular president – while noting that affidavits submitted under a pseudonym are permitted only where "the actual person can be identified" (internal citations omitted)).

can establish an actual or imminent injury"); *see also Tenn. Republican Party (16-3360) v. SEC*, 863 F.3d 507, 520 (6th Cir. 2017) (stating that associational standing "requires that the plaintiff-organization 'name the individuals who were harmed' unless 'all the members of the organization are affected by the challenged activity'" (quoting *Summers*, 555 U.S. at 498)); *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1011 (7th Cir. 2021) (recognizing that "courts have read *Summers* to expressly require names for associational standing on the pleadings").

Plaintiff's argument that it need not identify members by name because the "mere addition of their names would serve no Article III purpose" is unavailing.  Reply at 4.  The Supreme Court has articulated important purposes served by requiring specific, named members with standing.  Such standing requirements "assure[] that 'there is a real need to exercise the power of judicial review in order to protect the interests of the complaining party,'" *Summers*, 555 U.S. at 493 (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 221 (1974)), and that a plaintiff has "'such a personal stake in the outcome of the controversy' as to warrant *his* invocation of federal-court jurisdiction," *id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975)).  Absent identified members, courts would face "the difficulty of verifying the facts" upon which standing depends, which is the case here.  *Id.* at 499.[4]  And it is not this Court's role to question and rewrite the Supreme Court's mandate.

---

[4] Relatedly, the Court is unable to hold the anonymous declarants to their statements under penalty of perjury as required by 28 U.S.C. § 1746.  *See Doe v. L.A. Unified Sch. Dist.*, No. 16-cv-00305 (CAS), 2017 WL 797152, at *9 (C.D. Cal. Feb. 27, 2017) (rejecting declarations that did not provide the name of the individual signatory because "[w]ithout any record whatsoever of a witness's identity or their signature, a declarant cannot be held to their statements under 'penalty of perjury'"); *see also Keyview Labs v. Barger*, No. 20-cv-02131, 2020 WL 8224618, at *6 (M.D. Fl. Dec. 22, 2020) (finding the plaintiff "cannot rely on Jane Doe's declaration to meet its high burden to obtain a preliminary injunction") (collecting cases), *report and recommendation adopted*, 2021 WL 510295 (M.D. Fla. Feb. 11, 2021).

Plaintiff argues that anonymity serves the purpose of "protecting individuals who might prefer to remain anonymous."  Reply at 4.  The Court is sympathetic that individuals may wish not to publicize their identities.  But when a plaintiff brings a lawsuit in federal court, it bears the burden of establishing the Court's Article III power to adjudicate its case.  *Faculty*, 11 F.4th at 74.  There are procedures for keeping information confidential in a litigation if legal standards are met; indeed, courts have carved out procedures that allow even a party to request to proceed anonymously when warranted and the requisite showing is made.  *See, e.g.*, *Sealed Plaintiff v. Sealed Defendant #1*, 537 F.3d 185, 189 (2d Cir. 2008) ("Courts have nevertheless 'carved out a limited number of exceptions to the general requirement of disclosure [of the names of parties], which permit plaintiffs to proceed anonymously.'").  Plaintiff never made such a request, despite the identification of this issue by the Court at the September 21, 2022 hearing.  *See, e.g.*, *Publicola*, 2022 WL 17256714 at *3-5 (dismissing appeal where an unnamed appellant never made a request to the court to proceed anonymously).[5]

Finally, while the Court concludes that Plaintiff would need to identify at least one member by name even at the pleading stage, it notes that a plaintiff's burden to establish

---

[5] *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449 (1958), cited by *New York v. United States Department of Commerce*, 351 F. Supp. 3d at 606 n.48 and relied on by Plaintiff here (Reply at 4), does not support the proposition that a "fundamental purpose of the associational standing doctrine" is to "protect[] individuals who might prefer to remain anonymous," *id*.  There, the organization resisted a motion to compel production of its entire membership lists for purposes of corporate registration requirements "because it and its members are in every practical sense identical" and the organization itself would have been adversely affected.  *NAACP*, 357 U.S. 459.  Indeed, the *Summers* Court distinguished *NAACP* as a case falling into the narrow exception of associational standing "where *all* the members of the organization are affected" – which is not the theory advanced by Plaintiff here.  *Summers*, 555 U.S. at 499.  The only other case cited by *United States Department of Commerce* for this premise, *United Food & Commer. Workers Union Local 751 v. Brown Grp.*, 517 U.S. 544, 552 (1996), does not address the propriety of using anonymous members to assert associational standing.

standing is even greater on a preliminary injunction motion, where it is "no less than that required on a motion for summary judgment." *Cacchillo*, 638 F.3d at 404 (a preliminary injunction motion requires a plaintiff "set forth specific facts" in contrast to the lower burden at the pleading stage). Plaintiff falls short of that burden here. *See, e.g.*, *Patterson v. Cty. of Oneida*, 375 F.3d 206, 223 (2d Cir. 2004) (finding the requirement to "set forth specific facts" was "not satisfied by an affiant whose identity is not disclosed"); *Associated Gen. Contractors of Am.*, 713 F.3d at 1194 (rejecting association's challenge to affirmative action plan at summary judgment for lack of standing because the association did "not identity any affected members by name").

Because Plaintiff does not identify by name any member with standing or advance a theory that all of its members have standing, Plaintiff lacks Article III standing. *See Summers*, 555 U.S. at 498-99.

### 2. Injury in Fact

Even if Plaintiff had identified Members A and B by name, the pleadings and evidence provided by Plaintiff do not establish that its members have suffered injury in fact, another requirement for Article III standing. *See, e.g.*, *Carney v. Adams*, 141 S. Ct. 493, 502-03 (2020) (dismissing claims for lack of an injury in fact); *Filozof v. Monroe Cmty. Coll.*, 583 F. Supp. 2d 393, 403-04 (W.D.N.Y. 2008) (same, on a motion for a preliminary injunction), *aff'd*, 411 F. App'x 423 (2d Cir. 2011).

To establish standing to challenge an allegedly discriminatory selection policy, "a plaintiff must submit to the challenged policy." *Jackson-Bey v. Hanslmaier*, 115 F.3d 1091, 1096 (2d Cir. 1997). "This threshold requirement for standing may be excused only where a plaintiff makes a substantial showing that application . . . would have been futile." *Id*. (citing

*Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365-66 (1977)); *Carney*, 141 S. Ct. at 503

(recognizing that "a plaintiff need not translate his or her desire for a job . . . into a formal

application where that application would be merely a futile gesture" (internal quotation marks

and citation omitted)).  "However, an unsupported claim of futility is not enough to excuse a

plaintiff's failure to apply."  *Jackson-Bey*, 115 F.3d at 1096.

Additionally, such a plaintiff must show that they are "able and ready" to apply.  *Ne. Fla.

Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666

(1993).  This can be a "highly-fact specific" undertaking and requires more than the non-

applicant's belief that they meet the "minimum qualifications" and are "able and ready."

*Carney*, 141 S. Ct. at 500-01 (concluding that the plaintiff lacked standing where the overall

context did not demonstrate they were "able and ready" to apply); *see Houser v. Pritzker*, 28 F.

Supp. 3d 222, 238 (S.D.N.Y. 2014) ("Applicants who fail to meet the basic eligibility

requirements for employment cannot demonstrate that they suffered a 'particularized' personal

injury by being denied such employment.").  Being "able and ready" to apply "requires an intent

that is concrete."  *Carney*, 141 S. Ct. at 502; *see Faculty*, 11 F.4th at 76 (holding that the plaintiff

lacked standing without a "description of concrete plans to apply" (internal quotation marks

omitted)).

In support of its argument that it was futile for the Members to apply, Plaintiff alleges

that "white and Asian-American applicants need not apply" to the Fellowship because "Pfizer

explains that an applicant must '[m]eet the program's goals of increasing the pipeline for Black /

African American, Latino / Hispanic and Native Americans' [] and it conspicuously leaves out

otherwise qualified white and Asian-American students from being eligible to apply."  Compl.

¶¶ 43, 45.  Defendant, in turn, states in its brief that "Plaintiff cites nothing in the materials about

the Fellowship that categorically bans any applicant from applying."  Opp. at 22.  Defendant's

Fellowship materials further state that "Pfizer is an equal opportunity employer" immediately

before listing the program requirements, Pl. Ex. B at 2, and "Pfizer is committed to equal

opportunity in the terms and conditions of employment for all employees and job applicants

without regard to race," Pl. Ex. C at 4.   Perhaps the program's goals of increasing the pipeline

could potentially be achieved through the selection of candidates who are committed to and have

demonstrated experience in diversity efforts, regardless of the candidate's race.  But Defendant

has not stated or put forth evidence of any alternative interpretation of the stated goal of the

Fellowship to that posited by Plaintiff.  Nor has Defendant discussed how candidates who are not

Black / African American, Latino / Hispanic and Native Americans could meet the program's

stated goals.

      The Court need not determine whether it would be futile for the members to apply

because Plaintiff has not adequately shown that at least one identifiable member is "able and

ready" to apply.  As an initial matter, the anonymous declarations are entitled to diminished

evidentiary weight on this motion, if any weight at all.  *See supra* at 12-19 & n.4; *Patterson*, 375

F.3d at 223 (finding the requirement to "set forth specific facts" was "not satisfied by an affiant

whose identity is not disclosed").  Even when affording those declarations full weight, however,

Plaintiff has not affirmatively shown that Member A and Member B meet the minimum

Fellowship qualifications and are able and ready to apply.

      Plaintiff argues that its members have standing because a non-applicant plaintiff

"satisfies the requirements of standing by stating that he is 'able and ready to apply' when the

discrimination stops."  Reply at 2.  But the Supreme Court has rejected the notion that a non-

applicant's assertion that they are able and ready to apply is sufficient.  In *Carney v. Adams*, the

plaintiff challenged a party-membership requirement that limited who was eligible to apply for certain state judicial positions.  141 S. Ct. at 496-98.  The plaintiff claimed that the eligibility "requirement prevent[ed], him, a political independent, from having his judicial application considered . . . ."  *Id*. at 499.  In support, the plaintiff stated that he "wants to be, and would apply to be, a judge on any of Delaware's five courts" and "that he meets the minimum qualifications to apply for any judicial officer position," given his background, experience, and "12 years as a lawyer for the Delaware Department of Justice."  *Id*. at 499-500.  The Supreme Court determined that he "fail[ed] to show that, at the time [the plaintiff] commenced the lawsuit, [he] was 'able and ready' to apply for a judgeship in the reasonably foreseeable future."  *Id*. at 501-02.  The Court rejected as insufficient the plaintiff's affirmation that he "would apply" if the discrimination stopped, and noted that "similar cases in which this Court has found standing all contained more evidence that the plaintiff was 'able and ready.'"  *Id*.

The Supreme Court concluded in *Carney* that the plaintiff's "few words of general intent" and the context of the case did not show an injury in fact.  *Id*.  Although the plaintiff stated that he would apply and believes that he met all of the qualifications for the positions, this did not "show that [the plaintiff] was 'able and ready' to apply" and did "not sufficiently differentiate[] [the plaintiff] from a general population of individuals affected in the abstract by" the challenged qualification.  *Id*. at 500-02.  To hold otherwise, the Court reasoned, "would significantly weaken the longstanding legal doctrine preventing this Court from providing advisory opinions."  *Id*. at 501.  The Supreme Court noted the plaintiff's change of party affiliation not long before commencing the lawsuit further indicated that the plaintiff's desire was to challenge the eligibility requirements, not to apply to a judicial position.  *Id*.

Here, the perfunctory two-page anonymous declarations from Members A and B simply track the Fellowship requirements and provide very little facts showing that the members – from undisclosed universities, with unnamed majors or courses of study, with little to no details about their career and educational goals, employment history, or interests – were ready and able to apply to the Fellowship.  Specifically, the Fellowship requires that an applicant have a "[c]ommitted interest & intent to pursue an MBA, MPH, or MS Statistics program."  Pl. Ex. A at 5.  At most, the anonymous declarations and Complaint indicate that Members A and B were "drawn" to the Fellowship by the scholarship component, that a fully funded MBA "would be a wonderful way to enrich [their] professional experience," and that they would "gain valuable management skills" through such a program.  A Decl. ¶ 8; B Decl. ¶ 8.  While these statements indicate some benefit gained from such graduate programs, they do not provide any information, facts, or prior experience that show a "committed interest and intent" to pursue them.  *See, e.g.*, *Houser*, 28 F. Supp. 3d at 238 (finding that three plaintiffs whose qualifications fell below those required for the position "cannot demonstrate an injury-in-fact sufficient to prove Article III standing").

The brief conclusory sentences in the anonymous members' declarations regarding their leadership experience are also not enough to establish that they have demonstrated the "exceptional leadership potential" required for the positions.  Member A's declaration states that the member is "involved in campus life and activities and hold[s] leadership positions in student organizations," and that the member "previously led and organized volunteer programs." A Decl. ¶ 6.  In nearly identical fashion, Member B is allegedly "involved in campus life and hold[s] leadership positions in various campus activities, including student government." B Decl. ¶ 6.  These generalized recitals do not allege with particularity any activity, leadership

position, or volunteer program, nor do they demonstrate that the members possess "exceptional leadership potential."

Further, there are no allegations that either anonymous member has pursued opportunities similar to the Fellowship in the past, has engaged in a course of study at their unnamed university that would demonstrate an interest in pursuing a program like the Fellowship, or has any prior involvement with or interest in Pfizer, biopharmaceutical companies, or business management generally.

In sum, these sparse declarations do not establish that Plaintiff's members have an "intent [to apply] that is concrete." *Carney*, 141 S. Ct. at 502. Indeed, the members' statements that they joined Plaintiff's newly created organization because they "support its mission as well as this lawsuit," further suggests a generalized grievance against Defendant's alleged affirmative action efforts, not an actual desire by the members to apply to the Fellowship and work at Pfizer. A Decl. ¶ 11; B Decl. ¶ 11; *see* Opp. at 5. Similarly, in *Carney*, the Supreme Court concluded that the plaintiff's change of party affiliation before he commenced the lawsuit "suggests an abstract, generalized grievance, not an actual desire to" apply for a judicial post and become a judge. 141 S. Ct. at 502.

Therefore, the Court concludes that Plaintiff has not established injury in fact necessary for Article III standing because Plaintiff's members have "not sufficiently differentiated [themselves] from a general population of individuals affected in the abstract by the [program] [they] attack[]." *Carney*, 141 S. Ct. at 502 (concluding that the plaintiff's words "I would apply" were insufficient without concrete supporting facts, such as past injury, prior applications, prior relevant conversations, or other preparations for the position); *see, e.g.*, *Filozof*, 583 F. Supp. 2d at 403 (on preliminary injunction motion, finding the plaintiff "failed to show that he was 'able

24

and ready' to seek the" affirmative action opportunities because he "does not allege that he ever attempted to attain the benefits of networking, leadership, or other training programs during his employment").

### B. Claim-Specific Standing

Even if Plaintiff had provided named member declarations with more definite affirmative facts regarding the members' qualifications and a concrete intent to apply, the Complaint must still be dismissed because Plaintiff also lacks standing to bring the particular federal claims alleged.

#### 1. Section 1981

In this Circuit, an association lacks standing to assert claims on behalf of its members under the Civil Rights Act. *See Aguayo v. Richardson*, 473 F.2d 1090, 1099 (2d Cir. 1973) (holding that an association may not "sue under the Civil Rights Act for the violation of rights of members"). The Second Circuit has applied this principle to Section 1981 claims. *See Warth v. Seldin*, 495 F.2d 1187, 1194 (2d Cir. 1974) (finding no associational standing under Sections 1981, 1982, and 1983). And the Circuit has reaffirmed this precedent repeatedly. *See, e.g.*, *N.Y. State Citizens' Coal. for Child. v. Poole*, 922 F.3d 69, 74 (2d Cir. 2019) (reaffirming this "string of opinions" starting with *Aguayo*).

Plaintiff argues that *Aguayo* and its progeny apply only to Section 1983 of the Civil Rights Act and not Section 1981. Reply at 5-6. Further, Plaintiff suggests that the rule against associational standing in *Aguayo* contradicts subsequent Supreme Court precedent, and that "in the absence of controlling Second Circuit case law on § 1981," this Court should conduct an independent analysis of Section 1981 standing. *Id.* at 6. The Court disagrees and concludes that

the Second Circuit's rule against associational standing applies equally to claims brought under Sections 1981 and 1983 and thus this Court is bound to follow that precedent.

In *Aguayo v. Richardson*, the Second Circuit held that an organization could not bring a Section 1983 claim based on associational standing.  473 F.2d at 1099.  The Second Circuit observed that "Section 1983 confers a cause of action on 'any citizen of the United States or other person within the jurisdiction thereof' who has been deprived under color of state law 'of any rights, privileges, or immunities secured by the Constitution and laws.'"  *Id*.  The Court concluded that, "[n]either this language nor the [statute's] history . . . suggests that an organization may sue under the Civil Rights Act for the violation of rights of members."  *Id*. (internal citation omitted).

One year later, in *Warth v. Seldin*, the Second Circuit applied *Aguayo* to conclude that an association lacked standing to bring claims on behalf of its members under Sections 1981, 1982, and 1983.  495 F.2d at 1194 ("It is highly doubtful that an organization has standing to represent its members in most cases under the Civil Rights Act . . . [the organization] therefore lacks standing." (citing *Aguayo*, 473 F.2d at 1099)).  On appeal, the Supreme Court in *Warth* affirmed the Second Circuit on other standing grounds.  422 U.S. 490, 517-18 (1975).  In *dicta*, the Supreme Court noted that, "[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members."  *Id*. at 511.

Plaintiff argues that the Second Circuit's associational standing rule set forth in *Aguayo* contradicts, and thus does not survive, the Supreme Court's *dicta* in *Warth*.  Reply at 6.  But the Second Circuit has rejected that argument and continues to rely on *Aguayo* and its decision in *Warth*.  In *League of Women Voters of Nassau County v. Nassau County Board of Supervisors*, decided nine years after *Warth*, the Second Circuit held that the plaintiff organization did "not

have standing to assert the rights of its members" under Section 1983.  737 F.2d 155, 160-61 (2d
Cir. 1984).  The Court approvingly cited its decision in *Warth* as "denying standing to a housing
organization" and reiterating that "[i]t is highly doubtful that an organization has standing to
represent its members in most cases under the Civil Rights Act."  *Id*. at 161 (quoting *Warth*, 495
F.2d at 1194).  The Second Circuit concluded that it must "[n]ecessarily . . . adhere to our prior
decisions."  *Id*.

The Second Circuit relied on the *Aguayo* line of cases again in *Nnebe v. Daus*, 644 F.3d
147, 156 (2d Cir. 2011).  There, the Court held that it was "bound to agree with the district court
that [the plaintiff organization] cannot bring this action as the representative of its members"
under Section 1983.  *Id*.  The plaintiff there – like Plaintiff here – argued that "this rule is
'contradicted by a raft of Supreme Court precedent' and was effectively rejected by the Supreme
Court in *Warth v. Seldin*."  *Id*. at 156 n.5.  The Second Circuit rejected that argument because it
had "reaffirmed the *Aguayo* rule in *League of Women Voters* nine years after *Warth* . . . [and] we
are bound by the implicit determination of prior panels that the rule survives *Warth* . . . ."  *Id*.  As
previously stated, the Second Circuit reached the same conclusion in 2019 when it again
reaffirmed the "string of opinions" beginning with *Aguayo* and continuing past *Warth*.  *N.Y.
State Citizens' Coal. for Child.*, 922 F.3d at 74-75 ("In a string of opinions, this Court has held
that organizations suing under Section 1983 must, without relying on their members' injuries,
assert that their own injuries are sufficient to satisfy Article III's standing requirements.")
(internal citations omitted).

Since the Second Circuit has concluded that there is no associational standing under the
Civil Rights Act, including for Section 1981 claims, and has reaffirmed that line of cases, this
Court is bound to apply that precedent to Plaintiff's Section 1981 claim here.  *See Warth*, 495

F.2d at 1194; *see also N.Y. State Citizens' Coal. for Child.*, 922 F.3d at 74.  Accordingly, Plaintiff lacks standing to assert the Section 1981 claim on behalf of its members.  *See, e.g.*, *Warth*, 495 F.2d at 1194 (concluding that the plaintiff lacked associational standing to bring a Section 1981 claim on behalf of its members).

### 2.  Title VI and Section 1557

Title VI provides that no person "shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  For purposes of Title VI, "the term 'program or activity' and the term 'program' mean all of the operations of . . . an entire corporation . . . (i) if assistance is extended to such corporation . . . as a whole; or (ii) [the corporation] is principally engaged in the business of providing . . . health care . . . ."  42 U.S.C. § 2000d-4a(3)(A)(i)-(ii).  In other words, Title VI is limited to cases where (1) an entity discriminates under a "program or activity" for which it receives federal funding; (2) the entity receives federal funding as a whole; or (3) the entity receiving federal funding is principally engaged in providing health care (or one of the other services enumerated in 42 U.S.C. § 2000d-4a(3)(A)(ii)).

Section 1557 of the Affordable Care Act provides that "an individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964 . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance . . . ."  42 U.S.C. § 18116(a).  Under Section 1557, the "term 'health care provider' means any individual, group practice, corporation of health care professionals, or hospital (i) licensed, registered, or certified under Federal or State laws or regulations to provide health care services; or (ii) required to be so

licensed, registered, or certified but that is exempted by other statute or regulation." 42 U.S.C.
§ 18122(2)(B).  The United States Department of Health and Human Services' regulations define
"health program or activity" to "encompas[s] all of the operations of entities principally engaged
in the business of providing healthcare that receive Federal financial assistance." 45 C.F.R.
§ 92.3(b).

Here, Plaintiff contends that Defendant is principally engaged in the business of
providing healthcare and receives financial assistance as a whole, so Defendant may be subject
to race discrimination claims under Title VI and Section 1557.  Opening Br. at 10-13; Reply at
11-13.[6]  Defendant argues that its operations are "not subject to Title VI or § 1557" because
Defendant is not a healthcare provider and does not receive federal assistance as a whole.  Opp.
at 16-19.  Defendant also argues that "Plaintiff's Title VI claim fails because Plaintiff does not
show – because it cannot show – that Pfizer receives federal funds aimed primarily at providing
employment."  *Id.* at 19 n.11.  Plaintiff does not address the latter argument.  The Court finds
Plaintiff's allegations and evidence insufficient to establish standing under Title VI and Section
1557 for multiple reasons.

### a.  Assistance Aimed Primarily at Providing Employment

Plaintiff alleges that it would be futile for its members to apply to work at Pfizer through
the Fellowship since they are white and Asian-American, and that this alleged employment
discrimination violates Title VI and Section 1557 because Defendant receives federal financial
assistance.  *See* Reply at 2, 11-13; A Decl. ¶ 7 (describing desire to apply and work at Pfizer); B
Decl. ¶ 7 (same).  Given that Plaintiff has not alleged that Defendant receives federal financial

---

[6] Plaintiff does not advance the theory that the "program or activity"– the Fellowship – receives
federal financial assistance, and Defendant supplied evidence that the Fellowship does *not*
receive federal assistance.  *See* Bruce Decl. ¶ 17.

assistance for the primary purpose of providing employment, Plaintiff lacks standing to assert its claims under both Title VI and Section 1557.  *See, e.g.*, *Ass'n Against Discrimination in Emp't, Inc. v. City of Bridgeport*, 647 F.2d 256, 276, 284 (2d Cir. 1981) (finding claim that the company did not recruit, actively deterred, and did not hire applicants failed under Title VI because "[t]he complaint contained no express allegation" that the company received federal funds "aimed primarily at providing employment").

A plaintiff may not bring a claim under Title VI "with respect to any employment practice, employment agency, or labor organization except where a primary objective of the Federal financial assistance is to provide employment."  42 U.S.C. § 2000d-3.  "In the Title VI employment discrimination context, courts have construed Section 2000d-3 as imposing 'a threshold requirement . . . that the employer be the recipient of federal funds aimed primarily at providing employment.'"  *Bloomberg v. N.Y.C. Dep't of Educ.*, 410 F. Supp. 3d 608, 625 (S.D.N.Y. 2019) (collecting cases) (quoting *Ass'n Against Discrimination in Emp., Inc.*, 647 F.2d at 276); *see Johnson v. Transp. Agency*, 480 U.S. 616, 627 n.6 (1987) (noting that Congress imposed the requirement that Title VI applies only where the primary purpose of federal funds is to provide employment, lest "the receipt of any form of financial assistance . . . render an employer subject to the commands of Title VI rather than Title VII"); Opp. at 19 n.11 (citing cases).[7]

Courts in this Circuit routinely dismiss Title VI employment discrimination claims where the plaintiff does not satisfy this threshold requirement.  *See, e.g.*, *Murphy v. Middletown Enlarged City Sch. Dist.*, 525 F. Supp. 678, 709 (S.D.N.Y. 1981) (finding the Title VI plaintiff

---

[7] Both parties agree that Section 1557 "incorporates Title VI . . . ."  Opening Br. at 10; *see* Opp. at 16 ("Title VI and § 1557 (which incorporates Title VI) prohibits race discrimination . . . .").

lacked standing to bring an employment discrimination claim because the federal financial

assistance provided was not "designed with the primary objective of providing employment");

*Bloomberg*, 410 F. Supp. 3d at 625-26 (dismissing Title VI claim because the plaintiff did not

plead a "logical nexus between the use of federal funds and the [allegedly discriminatory]

practice") (internal citation omitted); *Johnson v. Cty. of Nassau*, 411 F. Supp. 2d 171, 174

(E.D.N.Y. 2006) (dismissing Title VI claims and observing that "courts have dismissed

complaints for failure to specify when funds were received, what they were used for, and

whether their primary objective was to provide employment") (collecting cases); *Bhanusali v.

Orange Reg'l Med. Ctr.*, No. 10-cv-6694 (CS), 2012 WL 13059694, at *8 (S.D.N.Y. Jan. 20,

2012) ("Covered entities can only be sued for employment discrimination under Title VI where a

primary objective of the Federal financial assistance . . . is to provide employment." (internal

citation and quotation marks omitted)).

Under Section 1557's plain language, the same threshold requirements under Title VI

apply to race discrimination claims under Section 1557.  Section 1557 provides that "[t]he

enforcement mechanisms provided for and available under such title VI, title IX, section 504, or

such Age Discrimination Act shall apply for purposes of violations of [Section 1557]."  42

U.S.C. § 18116(a); *see* 45 C.F.R. § 92.5 ("The enforcement mechanisms provided for and

available under, Title VI of the Civil Rights Act of 1964 . . . including under the . . . regulations

implementing those statutes, shall apply for purposes of violations of § 92.2 [providing non-

discrimination requirements] of this part.").

In other words, "the rights of action and corresponding remedies, including all of their

limitations, are to be drawn from the four federal civil rights statutes listed in 42 U.S.C.

§ 18116(a) and applied depending upon the nature of the discrimination alleged by a putative

Section 1557 plaintiff." *Se. Pa. Transp. Auth. v. Gilead Scis., Inc.*, 102 F. Supp. 3d 688, 699 n.3 (E.D. Pa. 2015); *see Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1210 (9th Cir. 2020) ("hold[ing] that Section 1557 does not create a new healthcare-specific anti-discrimination standard" and so, "to state a claim for a Section 1557 violation," a plaintiff must allege facts adequate under the applicable statute enumerated in Section 1557).[8]  This means that, where a plaintiff brings a Section 1557 claim for employment discrimination based on race, the requirements for employment discrimination based on race under Title VI apply.  *See Se. Pa. Transp. Auth.*, 102 F. Supp. 3d at 699-702 (applying Title VI requirements to the plaintiff's Section 1557 race discrimination claim and applying Section 504 requirements to the plaintiff's Section 1557 disability claim); *Whitman-Walker Clinic, Inc.*, 485 F. Supp. 3d at 33 ("In other words, a litigant bringing a [Section 1557] claim based on race discrimination in violation of Title VI cannot employ the enforcement mechanism available for sex discrimination under Title IX."); *cf. Weinreb v. Xerox Bus. Servs.*, No. 16-cv-6823 (JGK), 2020 WL 4288376, at *3 (S.D.N.Y. July 27, 2020) (finding "the weight of authority establishes that Section 1557 incorporates the standards of Title IX for health discrimination claims under Section 1557, the

---

[8] *See Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 15 (D.D.C. 2020) ("[Section 1557 and its implementing regulations] requires would-be plaintiffs to employ the particular enforcement mechanism and accompanying legal standard available under each of Section 1557's incorporated statutes, depending on the precise ground of discrimination asserted."); *T.S. v. Heart of Cardon, LLC*, 43 F.4th 737, 744 (7th Cir. 2022) ("All courts agree that a private right of action is an enforcement mechanism.  If one of the statutes cited in section 1557 provides a private right of action to challenge discrimination on a particular ground, section 1557 imports that right."); *York v. Wellmark, Inc.*, No. 16-cv-00627 (RGE) (CFB), 2017 WL 11261026, at *18 (S.D. Iowa Sept. 6, 2017) ("The Court concludes the plain language of § 1557 unambiguously allows discrimination claims under the enforcement mechanisms of the four identified statutes only."), *aff'd*, 965 F.3d 633 (8th Cir. 2020).

effect being that a Section 1557 plaintiff cannot allege sex discrimination under a disparate impact theory, which is not permissible under Title IX").[9]

Here, Plaintiff does not even allege that Defendant is "the recipient of federal funds aimed primarily at providing employment." *Bloomberg*, 410 F. Supp. 3d at 625 (quoting *Ass'n Against Discrimination in Emp., Inc.*, 647 F.2d at 276).  Nor does Plaintiff respond in its Reply to Defendant's argument (*see* Opp. at 19 n.11) that Plaintiff has failed to show this nexus. Instead, Plaintiff alleges that Defendant participates in certain public-private partnerships and receives Medicare and Medicaid reimbursements.  *See, e.g.*, Compl. ¶¶ 22-23, 25-26, 28; Gramling Decl. ¶ 8; Reply at 12-13.  Indeed, as for the particular employment allegedly sought by Plaintiff's members, Defendant has submitted evidence that the Fellowship "does not receive, and is not funded by, any type of assistance from the federal government."  Bruce Decl. ¶ 17.

Plaintiff's generalized allegations of federal financial assistance are insufficient to plead that the federal funds are primarily aimed at providing employment.  Therefore, Plaintiff has failed to establish standing to assert its Title VI and Section 1557 claims.  *See, e.g.*, *Bloomberg*, 410 F. Supp. 3d at 626 (dismissing Title VI claim because the defendant's generalized allegations that the plaintiff "is a recipient of federal funding . . . do not sufficiently plead the requisite 'logical nexus'"); *Bhanusali*, 2012 WL 13059694, at *8-9 (dismissing Title VI claim because the plaintiff "failed to set forth facts supporting the conclusion . . . that funds were primarily intended to provide employment" and rejecting argument that receipt of Medicare and Medicaid reimbursement "is primarily intended to provide employment" because "common

---

[9] *See also Briscoe v. Health Care Serv. Corp.*, 281 F. Supp. 3d 725, 738 (N.D. Ill. 2017) ("Title IX's enforcement mechanism applies to Plaintiffs' Section 1557 sex discrimination claim, so their claim fails because Title IX does not allow disparate-impact claims."); *York*, 2017 WL 11261026, at *18 ("Plaintiffs' [Section 1557] claim is for sex discrimination [so] Title IX's remedial scheme applies.").

sense dictates that . . . [it] is intended to pay for the provision of medical care for qualifying patients"); *see also Kelly v. Rice*, 375 F. Supp. 2d 203, 208-09 (S.D.N.Y. 2005) (finding the plaintiff's failure to allege that the defendant "is receiving federal funds in connection with" the allegedly discriminatory program "is absolutely fatal to her Title VI claim").

### b.  Principally Engaged in Providing Health Care

Because Plaintiff does not allege facts sufficient to satisfy the threshold requirement that Defendant receives federal assistance for the primary purpose of providing employment, the Court need not further consider Plaintiff's standing arguments under Title VI and Section 1557. Even assuming the threshold requirement was met, however, Plaintiff's claims still fail because it has not shown that Defendant is "principally engaged in the business of providing . . . healthcare."  Opening Br. at 11-12 (internal citation omitted); *see* Reply at 11-12.  Plaintiff argues that, under ordinary dictionary meanings, "principally engaged" means "the primary activities" of an entity, "provide" means "to supply or make available," and "health care" means "efforts made to maintain or restore physical, mental, or emotional well-being."  Reply at 11-12. By scribing the statutes with these definitions, Plaintiff contends that Defendant is subject to the statutes' reach.  *Id*.  Defendant argues that the meaning of these terms, as used in Title VI and Section 1557 and defined by case law, regulations, and dictionary meaning, does not embrace a biopharmaceutical company like Defendant.  Opp. at 17-18.  The Court agrees with Defendant.

Title VI, under 42 U.S.C. § 2000d-4a(3)(A)(ii), requires that a subject entity be engaged in "providing health care."  Section 1557, as implemented through 45 C.F.R. § 92.3(b), likewise requires that a subject entity be engaged in "providing healthcare."  While Title VI does not appear to define "health care provider," Section 1557 defines the term as "any individual, group practice, corporation of health care professionals, or hospital (i) licensed, registered, or certified

under Federal or State laws or regulations to provide health care services; or (ii) required to be so licensed, registered, or certified but that is exempted by other statute or regulation."  42 U.S.C. § 18122(2)(B).  Defendant, a global research-based biopharmaceutical company, does not fall within Section 1557's definition of a "health care provider."  *See* Compl. ¶¶ 12, 18; Gramling Decl. ¶ 3.

Both parties rely on federal regulations to define applicable terms.  *See, e.g.*, Opening Br. at 11; Opp. at 17 & n. 9.  Federal regulations generally define a "health care provider" as a person or entity, usually a licensed medical practitioner or facility, that renders medical treatment.  *See, e.g.*, 29 C.F.R. § 825.125(a)(1)-(2) (2016) (FMLA) (defining "health care provider" as a "doctor of medicine or osteopathy who is authorized to practice medicine or surgery" or "any other person determined by the Secretary to be capable of providing health care services"); 42 C.F.R. § 400.202 (2012) (Medicare) (defining "provider" as a "hospital, a c[ritical] a[ccess] h[ospital], a skilled nursing facility, a comprehensive outpatient rehabilitation facility, a home health agency or a hospice that has in effect an agreement to participate in Medicare, among others . . ."); 42 U.S.C. § 1395x(u) (Medicare provider enrollment definitions) ("The term 'provider of services' means a hospital, critical access hospital, rural emergency hospital, skilled nursing facility, comprehensive outpatient rehabilitation facility, home health agency, [or] hospice program . . . .").

Dictionary definitions of "health care provider" are consistent with Section 1557 and federal regulations.  For example, Black's Law Dictionary defines "healthcare" as "the services provided, usu[ally] by medical professionals, to maintain and restore health."  Healthcare, Black's Law Dictionary (11th ed. 2019).  Stedman's Medical Dictionary defines "provider" as a "term used by managed care organizations, referring to anyone rendering medical care, including

physicians, nurse practitioners, physician assistants, and others."  Provider, Stedman's Medical

Dictionary 732090 (Nov. 2014).  Plaintiff relies on Merriam-Webster to define "health care" and

argues that the definition therein "broadly includes 'efforts made to maintain or restore physical,

mental, or emotional well-being' of persons."  Reply at 12.  Plaintiff omits the remainder of the

definition, which continues, ". . . especially by trained and licensed professionals."  Health Care,

Merriam-Webster (Nov. 2022).  Plaintiff also omits that Merriam-Webster provides a second

definition of "health care": "the maintaining and restoration of health by the treatment and

prevention of disease especially by trained and licensed professionals (as in medicine, dentistry,

clinical psychology, and public health)."  *Id.*

Here, Defendant is a global research-based company engaged in the business of the

discovery, development, manufacture, marketing, sale and distribution of biopharmaceutical

products.  Compl. ¶¶ 12, 18; Gramling Decl. ¶ 3.[10]  This Court finds that such an entity is not a

health care provider as that term is used in the plain text of Title VI and Section 1557, federal

regulations, or dictionary definitions.  Moreover, Plaintiff has cited no case, and the Court is not

aware of any, that has found an entity like Defendant to be principally engaged in providing

health care for purposes of Title VI and Section 1557.  Rather, courts have concluded that the

provision of "health care" under these statutes refers to "some form of treatment or direct

assistance to individuals."  *Drachman v. Bos. Sci. Corp.*, 258 F. Supp. 3d 207, 212 & n.7 (D.

Mass. 2017) (finding that "a global Fortune 500 medical device company" is not a "health care

---

[10] Plaintiff's threadbare and conclusory allegation that Defendant's "principal focus is
healthcare" will not support a preliminary injunction here, especially in the face of specific and
supported facts proffered by Defendant.  *See, e.g.*, *Brooks v. Roberts*, 251 F. Supp. 3d 401, 432
(N.D.N.Y. 2017) ("Conclusory assertions lacking supporting evidence will not support a
preliminary injunction."); *Convergen Energy WI, LLC v. L'Anse Warden Elec. Co., LLC*, No. 20-
cv-5240 (LJL), 2020 WL 5894079, at *5 (S.D.N.Y. Oct. 5, 2020) (same) (collecting cases).

provider"); *see Bernier v. Trump*, 242 F. Supp. 3d 31, 44 (D.D.C. 2017) (finding a

biopharmaceutical company is "in the business of manufacturing" prescription drugs and is not a

"health program or activity"), *vacated on other grounds on reconsideration*, 299 F.Supp.3d 150

(D.D.C. 2018).[11]  Defendant is not principally engaged in providing treatment or direct

assistance to patients and therefore is not a "health care provider" for purposes of Title VI and

Section 1557.  *See* Gramling Decl. ¶ 4 ("Pfizer does not provide any medical treatment or

administrate any health care to any patient or person.").

Plaintiff's remaining arguments as to why Defendant should be considered a health care

provider are unavailing.  Plaintiff relies on *T.S. v. Heart of Cardon, LLC*, 43 F.4th 737, 739 (7th

Cir. 2022), to argue that Defendant's operations and the Fellowship "constitute a 'health program

or activity'" under the statutes.  Opening Br. at 11.  In *T.S.*, the defendant "operate[d] a skilled-

nursing and assisted-living facility" and did "not dispute that its primary business is providing

healthcare."  *T.S.*, 43 F.4th at 739-40 ("CarDon does not dispute that its primary business is

providing healthcare").  Here, Defendant is a biopharmaceutical company and not a nursing

facility, and Defendant does dispute that it is primarily engaged in providing healthcare.  Opp. at

17-18.

Finally, for the first time on Reply, Plaintiff argues that Defendant is principally engaged

in providing health care because it "offers direct medical treatment to patients in its clinical trials

'involving hundreds of thousands of people.'"  Reply at 12 (internal citation omitted).   This

---

[11] Both parties rely on caselaw interpreting the Rehabilitation Act for purposes of determining
whether Defendant is principally engaged in providing health care and receives federal financial
assistance as a whole under Title VI and Section 1557.  *See, e.g.*, Opp. at 18 & n.10; Reply at 11.
The Court does so too where appropriate.  *See Schmitt v. Kaiser Found. Health Plan of Wash.*,
965 F.3d 945, 954 (9th Cir. 2020) (assuming "the case law construing the Rehabilitation Act
generally applies to" claims under Title VI and Section 1557, "[g]iven the similar analytical
framework applied to claims" under those statutes).

argument "come[s] too late to support the current motion for a preliminary injunction."
*Adrianza v. Trump*, 505 F. Supp. 3d 164, 185 (E.D.N.Y. 2020) (declining to consider argument
raised for the first time on reply); *Barclays Capital Inc. v. Theflyonthewall.com*, 700 F. Supp. 2d
310, 352 n.12 (S.D.N.Y. 2010) ("Arguments raised for the first time in a reply may not be
considered when the opposing party is deprived of the opportunity to be heard as to that issue."),
*rev'd in part on other grounds* (2d Cir. 2011).  But even if considered, Plaintiff's untimely
argument fails because there are no factual allegations (or evidence) that "clinical trials" serve
the purpose of medical *treatment*.  In fact, the only source that Plaintiff cites for this point
supports the conclusion that such trials are conducted for the purpose of biopharmaceutical
research.[12]  Nor does Plaintiff's conclusory reference to clinical trials otherwise show that
Defendant is a "corporation of healthcare professionals" or meets the other criteria used to define
a "health care provider."  42 U.S.C. §18122(2)(B).  Most importantly, Plaintiff falls far short of
showing that clinical trials – or any other activity that Plaintiff argues constitutes "health care" –
are the "primary activities" of Defendant's global biopharmaceutical business.  *See Doe v.
Salvation Army in the U.S.*, 685 F.3d 564, 571 & n.10 (6th Cir. 2012) (concluding that
"principally engaged" means "the primary activities of a business" and not "incidental
activities"); *Collins v. Giving Back Fund*, No. 18-cv-08812 (CM), 2019 WL 3564578, at *10
(S.D.N.Y. Aug. 6, 2019) (same).

---

[12] Reply at 12 n.8 (quoting Pfizer, *Frequently Asked Questions—What are clinical trials?*,
https://www.pfizerclinicaltrials.com/about/frequently-asked-questions ("Clinical trials (or
research studies) are a type of medical *research* in which people volunteer to take part."
(emphasis added)).

### c.  Federal Financial Assistance as a Whole

Finally, the parties dispute whether Defendant receives federal financial assistance "as a whole" and is therefore subject to the statutes' reach on that basis.  Plaintiff argues, among other things, that Defendant receives federal financial assistance through Medicaid and Medicare reimbursements and private-public partnerships with the federal government, which constitute assistance as "a whole."  Opening Br. at 11-13; Reply at 12-13.  Defendant has submitted a declaration showing that it does not directly receive any Medicaid or Medicare reimbursements and argues that none of the alleged sources of assistance identified by Plaintiff constitute the receipt of assistance as "a whole."  Opp. at 18-19; Gramling Decl. ¶ 10 ("Pfizer does not receive any Medicare or Medicaid reimbursements directly from the federal government.").  Based on the pleadings and evidence presented, the Court finds that Defendant does not receive federal financial assistance as a whole.

As an initial matter, Title VI defines "program or activity" to mean the entire corporation where either "assistance is extended to such corporation . . . as a whole" or where the corporation "is principally engaged in the business of providing . . . health care . . . ."  42 U.S.C. § 2000d-4a(3)(A)(i)-(ii).  By contrast, Section 1557 (through an implementing regulation) defines "health program or activity" to only "encompas[s] all of the operations of entities principally engaged in the business of providing healthcare that receive Federal financial assistance" and does not include "as a whole" as an alternative prong.  45 C.F.R. § 92.3(b).  Therefore, Plaintiff's argument that Defendant is subject to Section 1557 because it receives assistance "as a whole" must fail.

"[T]he phrase 'as a whole' means that federal assistance is extended to the organization otherwise than for some specific purpose – put differently, that the recipient of federal funds

received those funds as general assistance." *Collins v. Giving Back Fund*, No. 18-cv-8812 (CM), 2019 WL 3564578, at *11 (S.D.N.Y. Aug. 6, 2019) (citing S. Rep, No 100-64, at 17 (1987)); *Boswell v. Skywest Airlines, Inc.*, 217 F. Supp. 2d 1212, 1216 (D. Utah 2002) ("Federal financial assistance extended to a corporation or other entity 'as a whole' refers to situations where the corporation receives general assistance that is not designated for a particular purpose." (internal citation omitted)), *aff'd*, 361 F.3d 1263 (10th Cir. 2004). Assistance may be received "directly or through an intermediary," but "entities that only benefit economically from federal assistance are not [covered]." *NCAA v. Smith*, 525 U.S. 459, 468 (1999) (conducting analysis in the Title XI context). Moreover, coverage "applies only to entities that *receive* federal funds" and not to entities that do "not actually *receive*" the assistance or are only "the *intended* beneficiary of federal funding." *T.W. v. N.Y. State Bd. of Law Exam'rs*, 996 F.3d 87, 94 (2d Cir. 2021).

Plaintiff's allegations that Defendant participates in certain public-private partnerships – namely, Defendant's collaboration in the AMP and with the NIH – do not establish that Defendant receives federal financial assistance as a whole. *See, e.g.*, Compl. ¶¶ 22-23, 25-26, 28; Gramling Decl. ¶ 8; *see also* Opening Br. at 13. Rather, as alleged by Plaintiff, each partnership consists of specific programs between Defendant and other entities. *See, e.g.*, Compl. ¶¶ 25, 28.[13] Plaintiff even delineates the alleged federal financial assistance by their designated programs. *See* Compl. ¶ 28 (listing approximate funding amounts designated for certain programs). This assistance is program-specific and, therefore, insufficient to show receipt of federal funding by Defendant's business "as a whole." 42 U.S.C. § 2000d-4a(3)(A)(i).

---

[13] Plaintiff's allegations that Defendant's CTI collaborated with the NIH between 2014 and 2019 are irrelevant because this is before the Fellowship was created. Compl. ¶ 22.

Although unnecessary in light of Plaintiff's pleading deficiencies, Defendant has provided evidence that it does *not* receive funding as a whole.  *See* Gramling Decl. ¶ 5 ("Pfizer does not receive any financial assistance from the federal government to operate its business as a whole.").  Defendant has also supplied evidence that it has not received federal funding with respect to the specific programs identified by Plaintiff.  *See, e.g.*, Gramling Decl. ¶ 7 (disclaiming any federal assistance with respect to Defendant's participation in the AMP), ¶ 9 (disclaiming any federal assistance with respect to the identified partnerships between Defendant and the NIH).  Put simply, Plaintiff has failed to show that Defendant's participation in public-private partnerships constitutes federal financial assistance to the company as a whole.  *See, e.g.*, *Collins*, 2019 WL 3564578 at *11-12 (finding the defendant's receipt of federal grant money was not "as a whole" because it was awarded in relation to a specific project); *Boswell*, 217 F. Supp. 2d at 1217 (finding federal assistance to an airline for the purpose of "serving particular rural airports and . . . routes" was not received "as a whole").

Finally, Plaintiff's allegation that Defendant "participates in the federal health program . . . by offering federally reimbursable products and medicines" does not establish that Defendant receives federal funding as a whole.  *See* Compl. ¶ 20.  The Second Circuit has held that the allegation that an entity's products are federally reimbursable is not enough to show that the entity receives federal financial assistance from those products.  *See T.W.*, 996 F.3d at 94 (finding the defendant did not receive federal financial assistance where it directly received payments from customers who could later seek federal reimbursement).

Plaintiff's Complaint does not allege that Defendant "actually *receive[s]*" money from those reimbursements.  *See id.*  Nor does Plaintiff show how receipt of money through such reimbursements would constitute federal assistance to Defendant "as a whole" and not for any

particular purpose.  *See generally Bhanusali*, 2012 WL 13059694, at *8 ("[C]ommon sense

dictates that . . . [Medicare and Medicaid reimbursement] is intended to pay for the provision of

medical care for qualifying patients[.]").  By contrast, Defendant has supplied a sworn statement

that it "does not receive any Medicare or Medicaid reimbursement directly from the federal

government."  Gramling Decl. ¶ 10.  Therefore, even assuming receipt of Medicaid and

Medicare reimbursement can constitute federal assistance, Plaintiff has not pleaded (or shown)

that Defendant receives federal funding from such reimbursements for its company as a whole.

*See, e.g.*, *Rose v. Cahee*, 727 F. Supp. 2d 728, 737, 739 (E.D. Wis. 2010) ("Thus, there is no

direct receipt or pass-through of Medicare and Medicaid funds and [the defendants] cannot be

deemed 'recipients' of federal funds."); *Sw. Fair Hous. Council v. WG Campana del Rio SH

LLC*, No. 19-cv-00179 (TUC) (RM), 2021 WL 321895, at *6 (D. Ariz. Feb. 1, 2021) (finding

defendant not subject to Section 1557 because there was "no evidence to support a finding that

Defendant receives federal funding in the form of Medicare and/or Medicaid").

       Accordingly, Plaintiff has failed to establish standing to bring claims under Title VI and

Section 1557.  *See, e.g.*, *Murphy*, 525 F. Supp. at 709 (dismissing employment discrimination

claim for lack of standing because the plaintiff failed to show the requisite nexus to "federal

financial assistance").

*          *          *

       Because the Court finds that Plaintiff lacks Article III standing and statutory standing to

bring the federal claims, the Court declines to address "the factors to be considered in deciding

whether to award a preliminary injunction" and will instead deny the Motion and dismiss the

case for lack of subject-matter jurisdiction.  *Rojas*, 793 F.3d at 259 (affirming dismissal for lack

of standing on a preliminary injunction motion); *see Cave*, 514 F.3d at 251 (remanding case for

the district court to dismiss the "complaint in its entirety," rather than deny only the preliminary

injunction motion, for lack of subject-matter jurisdiction); *see, e.g.*, *Roberts v. Bassett*, No. 22-

cv-710 (NGG) (RML), 2022 WL 785167, at *1 (E.D.N.Y. Mar. 15, 2022) ("Thus, as there is no

case or controversy before this court, the court declines to consider Plaintiffs' motion for a

preliminary injunction, and the case is DISMISSED."), *aff'd*, No. 22-622-cv, 2022 WL

16936210 (2d Cir. Nov. 15, 2022) (affirming dismissal of case at the preliminary injunction

stage); *E.F. v. Adams*, No. 21-cv-11150 (ALC), 2022 WL 601999, at *6 (S.D.N.Y. Mar. 1, 2022)

(on preliminary injunction motion, finding that certain plaintiffs "must be dismissed from this

case for lack of standing"); *Williams v. N.Y. State Off. of Mental Health*, No. 10-cv-1022 (SLT)

(JO), 2011 WL 2708378, at *4 (E.D.N.Y. July 11, 2011) (dismissing case for lack of standing on

a motion for preliminary injunction).  Where subject matter jurisdiction is lacking, "there is no

need to proceed" with a preliminary injunction hearing.  *See, e.g.*, *Pietsch v. Bush*, 755 F. Supp.

62, 68 (E.D.N.Y. 1991) (denying request for a preliminary injunction hearing because "the

Plaintiff has failed to allege an injury in fact, [so] there is no need to proceed . . . since the Court

does not have subject matter jurisdiction to hear this case").[14]

---

[14] The parties also did not request a hearing at the motion conference when Plaintiff withdrew its
request for a temporary restraining order and the parties indicated their preference for the Court
to issue its decision on the parties' submissions by year's end.  *See* ECF No. 25; *see, e.g.*, *Bowen
v. Goldstein*, No. 07-cv-10997, 2007 WL 4457242, at *2 (S.D.N.Y. Dec. 13, 2007) (no hearing
because the parties agreed at a conference to resolve the motion "on submission" and "[w]hen
parties are content in the district court to rest on affidavits, the right to an evidentiary hearing is
waived" (internal citation omitted)); *Weisshaus v. Cuomo*, 512 F. Supp. 3d 379, 386 & n.3
(E.D.N.Y. 2021).  The perfunctory notation on Plaintiff's briefs regarding an "oral hearing" does
not change the conclusion.  Oral argument would not have assisted the Court.  *See, e.g.*, *AD/SAT
v. AP*, 181 F.3d 216, 226 (2d Cir. 1999).  And even if there was subject matter jurisdiction, the
court need not hold a hearing where, as here, "essential facts are not in dispute," *Md. Cas. Co. v.
Realty Advisory Bd. on Lab. Rels.*, 107 F.3d 979, 984 (2d Cir. 1997), "disputed facts are
amenable to complete resolution on a paper record," or resolution of the preliminary injunction
factors would remain unchanged, *Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506, 512
(2d Cir. 2005); *In re H2O v. Town Bd. of E. Hampton*, 147 F. Supp. 3d 80, 98 (E.D.N.Y. 2015).

## II.  New York State and City Claims

Where a plaintiff lacks standing to bring federal claims, it is "clearly inappropriate for the district court to retain jurisdiction over the state law claims . . . ."  *Cave*, 514 F.3d at 250 (holding that the district court should have declined supplemental jurisdiction over state law claims where it denied the plaintiff's preliminary injunction motion for lack of standing); *see United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial . . . the state claims should be dismissed as well.").  Since the Court finds Plaintiff lacks standing to bring its federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiff's non-federal claims.  *See, e.g.*, *Cave*, 514 F.3d at 250-51.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for a Preliminary Injunction is DENIED and this action is DISMISSED without prejudice for lack of subject-matter jurisdiction.

Dated:  December 16, 2022
          New York, New York

SO ORDERED.

JENNIFER L. ROCHON
United States District Judge